We will proceed with argument in 20-3195CR, United States of America v. Vasquez-Drew. Why don't we hear from Mr. Larson? Please. And I understand you'd like to reserve two minutes, is that right? Yes, Your Honor. Oh, and the other thing, just to let me tell all of you, is that we will be trying to hold to the allocated argument times this afternoon to make sure that we move along. So, please go ahead. Thank you, Your Honor, and good afternoon. Matt Larson of the Federal Defender's Office for Mr. Vasquez. Before I begin, Your Honors, I'd like to acknowledge the presence in the courtroom today of Marco Machacao, the Bolivian Consul General here in New York. Thank you, and we welcome him. Your Honors, the governments of the United States and Bolivia agree with Mr. Vasquez that he should be resentenced. No one accuses the district judge of actual bias. But as the government commendably concedes, the error it invited when it urged the judge to send a strong message to Bolivians needs to be remedied. Your Honors, in response to that request, the judge said, I'm going to impose a very long sentence. Principally motivated by concerns about appropriate punishment, but also general deterrence. It is important that the people in Bolivia understand the kind of sentences that can be imposed here. Your Honors, because there would have been no reason to make the people in Bolivia understand if Mr. Vasquez weren't one of them, it appears here, to paraphrase this court's ruling in Leung, that there is a sufficient risk that a reasonable observer might infer, however incorrectly, that Mr. Vasquez's nationality played a role in determining his sentence. No more is required to order resentencing, this court said in CABA. Notably, Your Honors, Mr. Dooley does not distinguish this case from CABA or Leung. In those cases, as here, the judge's basing the sentence partly on a wish to deter others sharing the defendant's nationality or race created an appearance of injustice. Well, can I ask you about that? You say sharing his nationality or race. As I recall, the judge did not say Bolivians or people of Bolivian descent, but made a reference that was geographic, people in Bolivia. And, of course, in some context, that could be read to mean people who are Bolivian. But given this context, isn't the contrary argument that this is a case that involved importation of drugs from a geographical region and that there had been numerous arguments made that people in that geographical area here, Bolivia, felt that there was a certain impunity with which they could act, for example, because the DEA agents were no longer in the country. And therefore, because the offense conduct was geography specific, the nature of the general deterrence required could also be geographically specific. So could you maybe, I think that's the counterargument, could you just respond to that? Let me take your Honor's first point first. You said how we know that the people in Bolivia means Bolivians, as opposed to just people who are there. I would direct the Court's attention to the Rosero case, which we cite in our brief. There, where resentencing was ordered, the judge had said, we have a particular problem in this country with Colombia, and I want to send the proper message down there that people who get caught are going to be treated kind of harshly. In that case, this Court observed that the government had argued that those words could have applied to anyone who just happened to be in Colombia. But the Court said, no, we're ordering resentencing. It said these comments are all too reminiscent of those statements that we found in Leung, created at least a risk that a reasonable person— and on our cases, whether correct or not, might be so taken as enough. Absolutely, Your Honor. Leung set out the standard, which CABA then reaffirmed. The bar here, granted, is a low one, but it's a low one because of the interest at stake. This Court made clear in countless cases in this area of law that it's not enough that justice has to be done, but justice must appear to be done. If it could appear to a reasonable observer that a court is basing a sentence in part on a defendant's nationality or race or other prohibited status, that creates an appearance of injustice. Can I ask a question to change the hypothetical? Look at a hypothetical, changing the facts of this case. If the Court had not said people in Bolivia, but the Court had said, I want to send a message of general deterrence to people outside the United States, that importation of drugs into the United States, etc., etc., etc., is a serious offense, will be subject to punishment. Would you be making the same argument? I don't believe so, Your Honor, because that sounds like the Corretto case, which we also cite in our brief. There, the Court said, the defendant there was a Mexican accused of prostitution offenses, and the fact that he was Mexican came up. And the defense said, wait a minute, Your Honor, you can't say that. The judge said, no, no, no, no, no, no. I don't care where you're from, Mexico, Bolivia, Argentina, France, China, wherever. I don't care where you're from. If you're going to commit these crimes in America, you're going to be punished, regardless of your nationality. In Corretto, the Court even said, the district court did not say its sentencing of defendants was intended to serve as a message to people in Mexico. That's exactly what we have here, unfortunately. The language here is materially indistinguishable from the language in all of the cases in our briefs where this Court has ordered a resentencing. I guess I'm just wondering, though, with the hypothetical that I gave you, why wouldn't one be able to make the argument that if a judge says, I want to send a message to people outside the United States, that that statement could or should or might be read as, I want to send a message of general deterrence to non-American citizens. And then wouldn't that be a consideration or create an appearance where you're considering the national origin of the citizenship of the defendant? I think I see now the distinction Your Honor is drawing. Yes, if a court were to say, I want to send a message to anyone who's not American, that you're going to get punished really harshly if you break the laws. That would arguably be an apparent reliance on the fact that someone's not a U.S. citizen. We don't have that case here. The record we have shows very clearly that the people in Bolivia were to understand the message being sent by this very long sentence, which was based not only on a wish for appropriate punishment, but also to deter those people in Bolivia. If Mr. Vazquez weren't one, there would have been no reason to say this, and thus to a reasonable observer such as the government of Bolivia. Unless the goal was to deter anyone who was geographically located in Bolivia. Let's say Mr. Vazquez had been Dutch, but he was in Bolivia and he was bribing people and he was importing all these drugs to the United States. Would you be making the same claim today? I would then, again, the cases I've cited, Bracero, where the people down there and the government said, well, the people down there in Colombia, they don't have to be Colombian. No, just take this one. Would your argument be the same if Mr. Vazquez drew we're Dutch, but we're extradited from Bolivia? All the other facts are the same. And the judge said, I want to send a message to people in Bolivia. It's an interesting question, Your Honor. That's why I asked. If Mr. Vazquez were not Bolivian and was simply a visitor in Bolivia. Let's say he's a Dutch citizen, but he moved to Bolivia so he could engage in drug trafficking because that is a more, it's an easier venue from which one can send drugs to the United States. I guess that would pose a different question, Your Honor, here. Wouldn't an appropriate answer to that be that this might be a comment that would be taken as racist against Bolivians, but it would be harmless with respect to this person because his sentence was not based on his race. So that you might say, yes, this is still inappropriate, but harmless in the particular case because it doesn't affect that particular person. I don't know. It's a hypothetical, but that's a distinction one might make. Your Honor, my mind also went to the idea of standing, I guess, for lack of a better word. Standing is the last refuge of somebody, Your Honor. I do just want to focus, Your Honors, though, on the record in this case and the legal standard, which again is a low bar for a reason. We don't have to show, and we don't even allege, and no one does, that there's actual bias at work here. What we have to show and what we have shown, given the brief of at least one other party who does see a risk of unfairness in this case, that there is a sufficient risk that a reasonable observer might infer, even if incorrectly, that nationality contributed to this sentence. That's a low bar. This Court has applied it consistently in all the cases in this area. We've cleared it, and Mr. Dooley hasn't shown otherwise. I take it there's no evidence in the record about the percentage of the population of Bolivia that's made up of nonresident aliens? No, Your Honor. I'm thinking in terms of maybe regions of the United States. Suppose a judge said something like, I want to send a message to the people in Chinatown, or particularly a generation ago, I want to send a message to the people dealing drugs in Harlem. Would that not raise the kind of problem that you're suggesting? I think it would. If there is a general perception on the part of the public that most of the people who lived in Harlem at that time were African American, most of the people who live in Chinatown are of Chinese extraction, wouldn't that cause – I think you're making the same argument there, wouldn't you? Yes, Your Honor. I believe that there is a case decided by some reorder in which we vacated and remanded a sentence by Judge Weinstein, no less, a great judge, where something just of that sort was involved. Okay. Well, I think you've reserved two minutes, so thank you very much. Why don't we hear from the government? May it please the Court. My name is Sam Adelsberg, and I'm an assistant U.S. attorney in the Southern District of New York, and I represent the United States here, and I represented the United States in the district court as well. It is undisputed that the district court here harbored no animus towards the defendant in sentencing him, and that the district court's remarks reflect absolutely no bias or prejudice towards Mr. Vasquez Drew as a native Bolivian. However, under this court's precedence, that is not the dispositive question. Rather, in light of this court's decisions in United States v. Luang and United States v. Caba, this case requires vacatur and remand because the district court here expressed a desire to send a deterrent message to a particular national or ethnic group, namely the people in Bolivia. So can I ask you, was the government asking the court to send a message to a particular ethnic or national group? No, Your Honor, and I'd actually like to clarify what we were saying. Because I guess I'd like to know what the government was asking and why you think the district court, by what I thought was using roughly the same words, could somehow be viewed as saying something different from what the government was asking. Understood, Your Honor. The government's sentencing letter was certainly not a model of clarity. I should say, before I even explain our sentencing letter, that our understanding is that whether or not we invited the error, that shouldn't affect the analysis under U.S. v. Caba. Nevertheless, in our sentencing letter, we sought a sentence that would deter overseas traffickers along the lines of Your Honor's And do you think that's a permissible request on the part of the government? Yes, Your Honor, we do think that that would be a permissible request. And do you think that Overseas traffickers of any nationality Of any nationality Including Americans Including Americans, yes. And when the court then explained the reasons for its sentence, at the time, did you perceive those to be problematic in any way? Your Honor, you jump to my next point, which is that the government did not, and should have, corrected the record at that point. I was going to say, at that point, you could have jumped in and said, Your Honor, It's possible that your remarks could be construed in a certain way, and you could have asked for clarification on the spot, right? Absolutely. And in the next sentencing I do, if this happens, I will. But at that point, I did not. And if that happens, even if the court had said what it said here, and the court said, no, no, no, I mean anybody, But that would be all right. The court would be allowed, at least, to cure itself in a way that nobody could misunderstand. And that seems to be, Judge Calabresi, what happened in the Corretto case, where the initial comments by the judge were of the same vein of some of the cases that the Second Circuit has remanded. But then, seemingly immediately thereafter, the court clarified that, no, this is a, you know, the court's sentence here and its reasoning regarding general deterrence applies to any individual, wherever they are. This is not specific to this defendant, who I believe was Mexican in that case. Well, I don't mean to play a blame game here. I don't think that really matters. But the government did submit a fair amount of information about the specific situation in Bolivia, right? We did. And I think that, I'm glad you asked that point, you asked that question as well, Judge Lynch. Because the government is certainly, as part of its role in the sentencing process, should be providing the court with information, context. A defense doesn't occur in a vacuum. And as part of our role in the process, we do need to provide that context. Here, it's not immaterial that the defendant and his co-conspirators were operating from Bolivia, a place where the U.S. has no law enforcement presence. And where, as part of this specific conspiracy, members of the conspiracy, including the defendant, on recordings, were sort of gloating about the lack of U.S. law enforcement as a way to capitalize on that to send drugs into this country. And in our, again, very inarticulate sentencing letter, the operative paragraph, we actually start by talking about overseas drug traffickers. And then, later in the paragraph, we specifically talk about the defendant's comments. And our general deterrence message applies in that paragraph to overseas traffickers, but also to the defendant's co-conspirators, many of whom were not apprehended and have since not been apprehended. And so the reference that the appellant has sort of seized upon, that the government invited error in that way, I think is a misreading of actually what we wrote. It doesn't absolve the government from not writing the clearest sentencing letter, but it was a message to the court to deter overseas traffickers and specifically those in this case who, looking at the circumstances in Bolivia and the lack of U.S. law enforcement presence, sought to capitalize on that to send drugs into our country. Would your position be different if the court had said rather than the people in Bolivia, which appears intended to refer to this criminal network, but I suppose the argument is that it could be read more broadly to just be everybody in Bolivia. If the court had instead said, I want to send a message to members of the defendant's criminal network in Bolivia, in your view, would that yield a different result? Absolutely. I think that is in line with Jacobson and cases where the specific characteristics of the offense are being taken into consideration. There the court is saying, you know, there are members of this conspiracy who still need to be deterred, who are out there in Bolivia potentially still committing these same types of offenses, and the court is sending a message to those individuals. I think that would very much be in line with an offense specific as opposed to a nationality specific general deterrence message. Suppose a judge said something along the lines of, you know, I understand that there are a lot of immigrants in the Chinatown area who are reluctant to cooperate with the police because they think that our government, like the one they fled from, is corrupt and wouldn't protect them. And I want to send a message to all those people out there by this sentence, being the sentence of someone who may himself be of Chinese extraction, who victimized people in Chinatown. I want to send a message to show those people that the government is there to protect them. Would that be the same or different? In other words, another example of targeted deterrence, but with the emphasis on the victims rather than on the perpetrators, as it were. So I think that might be a different situation in that it doesn't appear to be that the defendant's own nationality is perhaps what's being considered in the general deterrent message as opposed to the victim. Well, I mean, it's sort of a, I mean, it's a trope going, you know, that you see in The Godfather, that in immigrant communities there are often people who are members of that community who, in the guise of being protectors or helpers of the community, prey on that community. So it would typically be, I take it, if a judge were inclined to want to send that message, that the defendant would also be of the same ethnic group. Yeah, I think it would depend perhaps on the language there, but I think the principle that invoking the defendant's membership in a specific nationality, as opposed to maybe a sub-community in America, which might be a difference, but to the extent that it's directed towards a larger community or a larger community outside the United States, that seems to be more on the spectrum towards being more problematic. I'm thinking particularly about the Arslana case, which I believe was 2021, where the lower court there spoke of deterrence in the Georgian community. I think it was not necessarily specific as to the Georgian community here and abroad. And again, it wasn't victim-specific, but there in a summary order. But it can get problematic, even if it's victim-specific, if through that you suggest that there are some people in an ethnic group who are preying on this specific group of victims, it can start looking ugly. After all, you know, koza nostra means our thing rather than the public thing. Res publica as against res nostra, and it's people who were doing something there, and it comes to mean something else. So I think, you know, that isn't this case. I don't know where we go, but one has to be very careful. I agree, Judge Calabresi. I think the specifics of what the judge said would be very important. In all these cases, I think the court generally looks to, you know, really does delve into what are the remarks itself. That being said, when there's this idea of sending a general message to an entire nationality, I don't think there's any case where the Second Circuit has not remanded. And that was why the government felt that here remand was appropriate. So your time is up, but thank you. And before we turn to the amicus, I will just say this. Regardless of how this court rules, we haven't decided obviously yet, would trust that a message will be sent in the spirit of this case, messages being sent to the United States Attorney's Office to be cognizant of, you know, when there is something said at sentencing that could easily be cleared up, it would make sense to clear it up at the moment and not wind up here where we're sorting things out afterwards, right? Absolutely, Your Honor. Thank you very much. Why don't we hear from the amicus? Mr. Dooley?  Thank you, Your Honor, and may it please the court. Again, I'm Ty Dooley, the court-appointed amicus. I'm joined by Emmett Gillis, also from Wigan and Dana. I think we've heard a couple of points of agreement between the parties here that would support affirming in this case rather than remanding. The government has just explained, and in fairness, I think this was clear in the government's sentencing memorandum, that the deterrent message they were asking for was to be sent to those peddling drugs in foreign countries to the United States. Specifically, they asked that Judge Coates send a strong message to individuals that selling poison in the United States carries serious consequences. Those individuals are identified in the very same paragraph of the government's letter as overseas traffickers who, by virtue of the fact that their conduct disproportionately impacts communities a world away, believe they are beyond the reach of the law. It was quite specific to not Bolivians as a whole, not the country of Bolivia, but the specific network of individuals in that country who were taking advantage of the And if that's what the court had said, I don't think we'd be here today. But the court took that and went one step further and used language, which I'm sure it didn't intend to be misread, and which don't necessarily have to be misread, but could be misread, might be misread. So, Judge Calabresi, I think the only way you can misread the comment is out of context, and that is what, with respect, the defendant has done here, because it misquotes that letter from the government repeatedly. It says that the government asked Judge Coates to send a message to Bolivians. The government never said that, okay? The government said to those people referring to this specific network. But isn't that so in all of the prior cases? Now, you know, I don't say necessarily that the prior cases are right, but they are there. Yes, Your Honor, and I believe we've tried to explain a sort of consistent thread throughout these prior cases. I won't say they are all entirely consistent, but essentially there appear to be aggravating factors each time this court has remanded for this reason and mitigating factors each time it hasn't. We think that this situation lines up very closely with the mitigating circumstance where there is an alternative explanation that is permissible for the district judge's comments. The alternative explanation, which I think is quite clear from the context, is that this message to the people in Bolivia is meant for a specific subset of the people in Bolivia who are engaged with this defendant in misconduct. And that's exactly the message that the government asked to be sent. I think there's no reason why one would conclude that Judge Cote went a step further and said, no, I want to send a message to all of Bolivia and not the specific subset that the government suggested. And I think that— Just to—I'm sorry. I was going to ask, Mr. Dooley, aren't—it's not a question— I don't think anyone is suggesting that it's a question of what the judge wanted to do to take a step beyond. The question is how might someone perceive that. And, of course, the someone who perceives that typically would not have access to the letter that the government sent to the court. The most public thing in the record is the transcript. It's the public pronouncement of sentence that we're concerned with here, right? Yeah, so I'd have two responses to that. I don't think it would be appropriate to say that a reasonable person does not understand the full context. I don't think—and, you know, I think some of my argument does depend on this notion, I'll concede, that a reasonable person has to be aware of the full context and not just, you know, walking into the courtroom for two minutes and hearing one snippet of the conversation. That said, even if you—as your Honor said, it's the transcript that's most important. This same message was spelled out in the sentencing transcript. The government referred to, quote, a network of military officials, airport security officials, and others that it urged that this deterrent message be sent to. And, again, many of these individuals were other defendants swept up in this same dragnet, right? Mr. Vasquez may have been, you know, a cattle farmer, but many of the other defendants were government officials, were airport officials and others who were part of this network. I think it's really clear that that was the message that the government asked the district judge to send, and that's the message that she intended to send. So the context, in other words, you're saying at a minimum is going to include the transcript because that's, of course, the only place where one finds the judge's comments, which are the ones we're talking about to begin with. So you're not going to assume, I suppose, that someone is going to somehow discover one line of a transcript without having the opportunity to read the entire transcript or would have walked in at one moment of the sentencing hearing, heard a sentence, and then walked out without having the context. You have at least the transcript as context. At least the transcript, which I think is enough. And I think it's really useful to look at the party's briefing here in that respect because the government says that this isolated comment is similar to comments that this court has found worthy of vacating a remand. I don't think that we should be judging based on an isolated comment. But my problem is that, and I've sat on a fair number of these cases, that if one looks at the whole context, it is almost always in the cases in which we have nonetheless reversed vacated, possible, probable even, to read it as being harmless. And yet that kind of context without a specific statement of the sort that the court might well have made and did in the Mexican case when the government asked them has been taken as might be taken. I think I'd like to respond to that because I think while it is true that in each of these cases, if you went back and asked the district judge, did you mean to impose this sentence because you don't like Colombians, because you don't like West Africans, obviously the answer is going to be no. And that would probably be a genuine answer. But there is still an appearance of partiality, of injustice, if the sentence is chosen because of the deterrent message that it will send to a broad group and chosen to be sent through the vehicle of the particular defendant because of his or her membership in that group. And this, Judge Nardini, to your point about the hypothetical Dutch defendant, I think really distinguishes this case. I see no reason why a Dutch person who was conspiring with airport officials and government officials in Bolivia, who was recorded speaking to confidential sources saying I've got these contacts, we can ship all this cocaine into the country because the DEA has been kicked out. I don't see why the same sentence and the same statements would have been made to that defendant. I fully disagree. Well, they probably were, but there wasn't a Dutch person in this case. And, you know, I don't know, maybe I'm stereotyping the country of Bolivia, but I'm not aware of a widespread perception in the United States that Bolivia is a nation of immigrants and a gorgeous mosaic with lots of different people, expats from all over the world flocking there. I do wonder how much of a distinction the reasonable American observer would make between the people in Bolivia and Bolivians. Well, again, I think even if you're just looking at the transcript, the government made very clear who they think the deterrent message should be sent to. It's not the people in Bolivia. It's not the Bolivians. It's this network. So it might not even be the random Dutch emigre who might be fantasizing about getting into the drug trade. You're saying this is the people in Bolivia meant not all the people who live there. Yes. It meant just this particular ring, your people in Bolivia, your network in Bolivia. Exactly, Your Honor. I think that's what emerges from the full context of this record. And I also think that there's a presumption that judicial officers uphold their duties, that they don't violate the Constitution. And we have already here a concession, and you can see it in the sentencing letter, that this is the deterrent message the government was trying to send, asking the district judge to send. She sent this message by saying the people in Bolivia. Why should we assume that, in fact, she was referring, and why would a reasonable person assume she was, in fact, referring to all the people in Bolivia, based on some sort of stereotype? Because many people would read that as might be doing that, and for better or for worse, our cases have said we want district judges to be more careful than perhaps they need to be to avoid any appearance of that sort. Can I- I mean, you know, that may not be the right standard, but it is an understandable standard, and it some does seem to be the one that we have picked. Can I just ask you, as your time is winding down, and I'll be interested in hearing from the appellant, is it your view that if we were to agree with the appellant and the appellee that this case falls within the lines of our precedence, like Cava, that there is an appearance of impropriety? Is the only remedial option to us, the one that we did follow in those cases, which is vacate for resentencing and reassign to a different judge, or in your view, is there any remedial option that we have that could be different, for example, remanding to the same judge for clarification? And I say that on the theory that there are cases, like I think it's the Corrida one, where the judge makes a statement which perhaps in isolation could be viewed as problematic, but then is given an opportunity when inquiry is made to say, no, no, that's not what I meant. Why is it in your view, or is there an option for, would there be an option to do that, or do you think our case is clearly foreclosed on that? No, there's absolutely an option. It's the Jacobson case, not Corrida, and this has come to be known as the Jacobson remand, which has been used in other contexts. But there, Judge Duffy made comments about the defendant, Kogut, that could be taken as the notion that he was sentencing him more severely than his co-defendants because he was an immigrant from Romania, or could be taken as suggesting that he was sentencing him more severely for legitimate reasons, specifically that he was intelligent, that he showed no remorse. There was an appeal. The court, in a decision by Judge Winter, remanded, while retaining jurisdiction, to Judge Duffy to explain. Which of these did you mean? And, of course, he said- But isn't the problem with that, I mean, it is, we did it there. Isn't the problem with that that then, in every case that comes up of this sort, we have to try to say how bad the judge's statement was. One advantage of the rule that we have is that it enables us to send it back in almost all of these cases without insulting the judge. If we buy yours, then in every case in which we don't send it back to the same judge, we're saying something worse. And just in terms of judicial administration, I just wonder- I'm very grateful for the question. I think that's a really important thing that you have to grapple with, okay? I think, if I'm being honest, the reason that you do this so often and that you say, oh, we don't question the district judge's motives, but because of the appearance of injustice, we need to remand, is because you don't want to call out some of these statements. Some of which are very- if you actually read the transcripts, they're a lot worse than you would think reading the Second Circuit opinion, including the Arslanic decision most recently. There was a lot more to that than is revealed in the summary order. And, respectfully, I think it's a cop-out. I think that it is your job, as reviewing judges, to explain what is appropriate, what is inappropriate, what is beyond bounds. District judges are required to provide statements of reasons for their sentences. If you just continue saying, we're sure nothing bad happened here, we're sure there was no impropriety, but because of this reason, because of CABA, because of Leong, we have to remand, what you're saying is, just don't say that part out loud anymore. And then defendants don't have the statement of reasons that they should be able to understand in order to take an appeal, to know why the district judge actually chose a sentence, and not just what the judge decided to say out loud, knowing that words can be stripped of context on appeal. So I do agree, Your Honor, Judge Calabresi, I think that's the reason. I think it's a very attractive rule for you to have, for the Second Circuit to have. But I'm sorry, you know, that's why you're reviewing court. I think you have to respect the fact that if there are inappropriate comments, it's up to you to explain why they're inappropriate, and that will help educate lower court judges on what's in bounds and out of bounds. I don't think this is anything like that. I think the context makes clear that the comments were appropriate. There was a permissible explanation for them. At a minimum, I think Judge Koch deserves the opportunity to explain that, and that would be the course of action in the Jacobs remand, which would be sort of an alternative outcome here. Thank you very much. Thank you very much. I appreciate it. Mr. Clarkson, why don't we hear from you? And would you just address Mr. Dooley's point that our practice of basically in all of these cases, vacating and remanding two different judge while always saying we're sure you didn't mean this in the wrong way might not just be a little bit of a cop-out? No, Your Honor, absolutely not. This is not a rule of convenience. This is a rule vital to respect for the judiciary. This court can't tax anyone. It can't arrest anyone. It has no power to enforce its rulings other than- You can arrest people if you give me a contempt in our presence, but let's hope we don't get there. Let's hope, Your Honor. My point is people follow this court's rulings because they respect the court, and the court has been keenly aware for decades that when the specter of race or nationality or another unconstitutional consideration creeps in and could arguably be seen as affecting the prison sentence someone has received, this court has an absolute duty to tread very carefully, as Judge Calabresi has observed, as Judge Lynch has observed, as I know Judge Nardini understands from sitting on the Arslanu panel. In that panel, speaking of- Mr. Dooley says, let's read the judge's remark about the people in Bolivia to just mean the criminals in Bolivia. Well, that's exactly what happened in Arslanu. Russian organized crime. Same thing in Leung. People who come here and deal heroin. The judge said, we have enough homegrown criminals. People who come here better abide by our law. The government said, that's totally reasonable, of course. If you come to this country, you should abide by our laws. This court said, no. The reliance on the ethnic background of the defendant, the arguable reliance, created an appearance of injustice. And speaking of context, your honors, Mr. Dooley says, if we look at the context of this case, we know there was impropriety. Again, irrelevant. This court in Gonzales, cited in our brief, the complete transcript does indeed convince us that the court was not motivated by any improper considerations. However, once again, we emphasize that we also must protect the appearance of justice. That is the theme running throughout these cases. It is not a cop-out. It's not a rule of convenience. Well, I think the cop-out reference, if I understand it, is that sometimes judges say things that are way beyond bounds, not just creating the possibility of an appearance. And I think the suggestion was that when judges really do say things that suggest that they really were motivated by something improper, we need to actually say that out loud. And by mixing or blending the two categories, treating them identically, where a judge, we think, really has perhaps thought an improper thought, and judges who have clearly not based their decisions on something improper but could be viewed as that, by treating them all as sort of one indistinguishable mass, we sort of do a disservice to the first category. I think that was the cop-out point, but I may have missed that. And I think this court may leave that question for another day because it's not presented here. No one's accused the judge of actual bias. What we have here is meeting the test set out in Leon. But what you're saying is that if we have a case of that sort, we as judges shouldn't hide behind these and say what is so. Yes, Your Honor, if there's a case where a judge undisputedly relied on the defendants. Undisputedly, but in a way that is so, we should say so. I will leave that to Your Honor's good judgment. I will not purport to tell the court how it should phrase its ruling. In this case, however, both of the parties, I think, have made it abundantly clear that you both take the position that Judge Cote did not, in fact, rely on any impermissible factor and was not actually motivated by bias in any way. You're both making simply the appearance are strictly. That is correct. And that's been literally every case in our briefs. That was the reason for the remand and resentencing. The last thing I want to speak to, just because I wasn't able to earlier, and Your Honor did ask me about this, this idea that Mr. Dooley is saying let's reread the record to say she wasn't talking about the people in Bolivia. She was punishing Mr. Vazquez because of his connections to the upper echelons of the government and the military and the fact that the DEA is not operating in Bolivia. And that's really the reason why. The first problem with that, Your Honors, is that the judge says utterly nothing about this. This Court is bound to look at the record of what the judge actually said in explaining this sentence. What she actually said was very short. It's on page 53 of the appendix. She said, conspiring to import cocaine is a significant crime, and I'm going to give you a very long sentence,  but also because I want to send a message here to the people in Bolivia. But the only people in Bolivia who had been discussed up to that point were the ones referenced by the government. Drug dealers like the defendant who sell such poison from afar by lining the pockets of corrupt officials along the way. I mean, just to be clear, nobody had ever been saying, and we don't like Bolivians and we think Bolivians should be punished. There had been, in context, only a discussion of punishing people involved in this network in particular ways. Well, two things, Your Honor. First, the fact that they were criminals. That is literally true in every single case. The only reason someone is going to be before a sentencing court is because they've been convicted of a crime. So when the judge says, I want to send a message to you, whether the judge says because you're a criminal or because you're from Russia or Bolivia or wherever, there's an appearance of injustice. The fact that the person is a criminal is irrelevant because all of these people, Your Honors, are criminals. They wouldn't be in court otherwise. Well, no, but if you took that point to its logical conclusion, if the district court had said, you're a drug importer, I need to send a message to all drug importers, you'd say, well, that's irrelevant because, of course, he's a drug importer. Your Honor, I'm sorry, my premise was that... That's the whole point of general deterrence is deterring other people who are similarly situated engaging in the same types of crimes. Don't do it. My premise is that there would also be a reference to nationality or race because that's the common thread in all of these cases. It's not just that the person is a criminal. It's also that then there's a reference to nationality or ethnic community. And as to these connections and networks, I want to make very clear here, Your Honors, that these were all disputed by Mr. Vasquez. You know, the government in its brief, and then Mr. Dooley in his, talks about the connections being worked into the military. I have a jet that can produce 60 tons of cocaine and bring it to the US. In fact, the government says in its sentencing letter that Mr. Vasquez had boasted that within 15 days he could produce 1,500 kilograms of cocaine. The record shows that during the course of the two-year conspiracy, 15 kilograms were produced. Mr. Vasquez said, everything that I told these confidential sources that the government was then quoting, this was all boasting, just trying to get some business. More... Why don't you just take, we've kept you up past your time. Why don't you just wrap up in 10 seconds? In 10 seconds, the 10-second version, Your Honor. Again, this case is, as I think Your Honors have recognized, within the mainstream, the uniform disposition of all of these cases when there is a reference to nationality or race and where it is possible that a reasonable observer might infer, however incorrectly, that the race contributed, that nationality contributed, we order a resentencing. Judge Calabresi suggested maybe these cases are right, maybe they're wrong. They are the law in this circuit, Your Honors. We've cleared this low bar. The government agrees, the government of Bolivia agrees. For all these reasons, to protect the appearance of justice, Your Honors, resentencing is required. Thank you very much. Very well argued on all parts, on both the appellant, the appellee, and we very much thank the amicus for appearing. Yes, thank the amicus particularly. Thank you all. And we will take the case under advisement before it's hand-determined. Court is adjourned.